UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MOHAMED EL-SAYED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil No. 14-14724-LTS |
| CARDA CL NEW ENGLAND, INC., and GARDA WORLD SECURITY CORPORATION, | ) ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DOC. NO. 30)

July 13, 2016

SOROKIN, J.

Plaintiff Mohamed El-Sayed ("El-Sayed") filed this employment discrimination action against Defendants Garda CL New England, Inc. and Garda World Security Corporation (collectively "Garda"), alleging three violations under Mass. Gen. Laws ch. 151B, § 4(1). See Doc. No. 1-1.  Garda has moved for summary judgment.  Doc. No. 30.  El-Sayed opposed the motion, Doc. No. 38, Garda filed a reply brief, Doc. No. 40, and the Court held a hearing.  Doc. No. 43.  After careful consideration of the parties' briefs and arguments, the motion is ALLOWED IN PART and DENIED IN PART.

I.   FACTUAL BACKGROUND[1]

---

[1] On summary judgment, the Court "view[s] the facts in the light most favorable to" the non-moving El-Sayed, "and draw[s] all reasonable inferences in his favor."  Ray v. Ropes & Gray LLP, 799 F.3d 99, 112 (1st Cir. 2015).

In August 2011, El-Sayed began working for Garda as an Armored Driver/Messenger at Garda's Needham, Massachusetts location. Doc. No. 32 ¶¶ 1, 2. El-Sayed emailed two superiors—Regional Director Jaime Lopez and Corporate Security Manager Brian Wilkins—on February 4, 2014, expressing interest in "grow[ing] within the organization and lead[ing] a successful branch." Id. ¶ 3. El-Sayed particularly wanted a job at Garda's Needham branch which did not involve driving armored trucks. Id. ¶ 16. He had expressed interest in getting a supervisory branch job as early as April 2013. See Doc. No. 32-2 at 27-28. Later in February 2014, Associate Director William Chouinard ("Chouinard") interviewed El-Sayed, among others, for a new "Supervisor of Operations" role. Doc. No. 32 ¶ 4.

In March 2014, a snowplow struck the armored car El-Sayed was driving on Interstate 95. Id. ¶ 5. Afterwards, El-Sayed requested a medical leave of absence, and, in support of his request, "submitted documents from his health care providers indicating that he was suffering from medical conditions that rendered him unable to perform any of his job functions." Id. ¶ 6. Sometime after March 31, 2014, Garda placed El-Sayed on Family and Medical Leave Act leave. See Doc. No. 32-2 at 70-77. While nobody at Garda precluded El-Sayed from returning to work, he never did. Doc. No. 32 ¶¶ 8-10. As of July 14, 2015, medical reasons still prevented El-Sayed from working. Id. ¶ 11.

Garda ultimately decided not to add, let alone fill, the new Supervisor of Operations position. Doc. No. 32-5 ¶ 5. In or around February 2014, Garda reassigned Brandon Rodriguez, a Driver/Messenger and Crew Leader, from driving armored trucks to working in the Needham branch's vault. Doc. No. 32-6 ¶¶ 4, 5. Rodriguez remained classified as a Driver/Messenger and Crew Leader, and his compensation did not change. Id. ¶ 5. However, Rodriguez did receive a

badge normally reserved for supervisors, and employees at the Needham branch regarded Rodriguez as, at the least, a de facto supervisor to turn to when necessary.  Doc. No. 32-2 at 147.

El-Sayed filed a complaint, dated July 1, 2014, with the Massachusetts Commission Against Discrimination ("MCAD").  Doc. No. 39-1.  El-Sayed's MCAD complaint contained a single count of discriminatory failure to promote.  Id. at 4.  "Specifically," it alleged, "on at least two different occasions, Garda promoted employees who are not members of Mr. El-Sayed's protected class, instead of [him], a Muslim Egyptian-American employee, despite the fact that [he] was sufficiently qualified for the position."  Id. ¶ 18.  Earlier in the MCAD Complaint, in a paragraph incorporated within Count I, see id. ¶ 16, El-Sayed alleged that shortly after he began at Garda, "coworkers and managers . . . would make derogatory comments and jokes about [his] Egyptian heritage, and following the Boston Marathon Bombings on April 15, 2014 [sic], Garda employees targeted [him] with disparaging comments about his religion and Muslims in general."  Id. ¶ 6.

El-Sayed subsequently filed the instant Complaint in Superior Court on October 17, 2014.  Doc. No. 1-1.  Garda then removed the case to this Court on December 24, 2014.  Doc. No. 1.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.  DISCUSSION

El-Sayed's Complaint brings three claims for relief: a discrimination claim on the basis of religion and national origin "by failing (repeatedly) to promote him," Doc. No. 1-1 ¶ 20; a hostile environment claim stemming from "El-Sayed's coworkers and managers engag[ing] in a pattern and practice of harassing, humiliating and embarrassing him about his Muslim religion," id. ¶ 23; and a similar hostile environment claim, stemming from "El-Sayed's coworkers and managers engag[ing] in a pattern and practice of harassing, humiliating and embarrassing him about his Egyptian national origin."  Id. ¶ 26.  Garda raises multiple arguments which, if all correct, require dismissal of the whole Complaint.  See Doc. No. 31.  The Court addresses these arguments by count, grouping (as the parties have in their briefs) the two hostile environment claims together.

    A.  Count I-Failure to Promote Claim

El-Sayed first claims that Garda discriminated against him by promoting people from driving armored trucks to working in Garda's Needham branch who were neither Egyptian nor

Muslim.  Doc. No. 1-1 ¶ 20.  In cases such as this one, where El-Sayed has not produced an explicit acknowledgment from Garda that it declined to promote him because of his religion and/or national origin, the Court utilizes the three-step burden-shifting framework the Supreme Court promulgated in McDonnell Douglas Corp v. Green, 411 U.S. 792, 802-05 (1973).  See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) ("Because [the plaintiff] has not offered 'direct proof' of [the defendant's] alleged discriminatory animus, 'we allocate the burden of producing evidence according to the now-familiar three-step framework set forth in McDonnell Douglas Corp. v. Green.'") (quoting Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995); Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) ("The familiar McDonnell Douglas framework governs . . . Massachusetts General Laws, chapter 151B claims.").[2]

    El-Sayed has the initial burden of demonstrating a prima facie case.  Ray, 799 F.3d at 113.  To do so, he must offer evidence that: (1) he is a member of a protected class; (2) he was qualified for a branch job; (3) Garda failed to promote him to a branch job; and (4) Garda either kept the position opened or filled it with a similarly-qualified individual not in the protected class.  See id.  The parties do not dispute that El-Sayed is a member of the protected classes of Egyptians and Muslims, El-Sayed's qualifications for a supervisory branch job, or that Garda failed to offer him such a job at the Needham branch.  They dispute whether El-Sayed has shown that Garda actually promoted anyone to a job that El-Sayed also wanted.

    El-Sayed's complaint alleged three instances of Garda promoting other people to supervisory branch jobs: the promotion of Dominic Barasanti to such a job, Doc. No. 1-1 ¶ 15; the promotion of Brandon Rodriguez to such a job, id. ¶ 16; and Garda's failure to promote El-

---

[2] The fact that El-Sayed overcomes Garda's motion, as discussed below, renders his contention that the McDonnell-Douglas framework does not apply here irrelevant.

Sayed to the Supervisor of Operations job he had applied to.  Id. ¶ 17.  However, El-Sayed does not dispute a lack of interest in the job Garda promoted Barasanti to, Doc. No. 32 ¶ 19, and that Garda decided against ultimately creating the Supervisor of Operations position, meaning nobody filled that role.  Id. ¶¶ 11-12.  Accordingly neither of those two instances can sustain El-Sayed's prima facie case.  Thus, to the extent El-Sayed tries to rely on these two instances to support his failure to promote claim, Garda's motion is ALLOWED and that part of Count I is DISMISSED.

Count I thus turns on whether Rodriguez's transfer demonstrates that Garda offered a promotion, which El-Sayed had sought, to someone else similarly qualified.  Garda makes two arguments that it does not: first, that El-Sayed never applied for this position; and second, that Rodriguez's branch position did not actually constitute a promotion.  The Court addresses each argument in turn.

        1.       *Lack of Application*

The record belies Garda's assertion that El-Sayed never applied for Rodriguez's new role.  Robust authority supports the proposition that "the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer."  Equal Emp't Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348-49 (3d Cir. 1990) (adopting this rule, and collecting cases in support of it); see also Duckworth v. Mid-State Mach. Prods., 736 F. Supp. 2d 278, 283 (D.Me. 2010) ("The rest of Mid-State's argument is premised on the erroneous assumption that in order to proceed with an ADEA claim, the Act

expressly requires that a claimant have been an applicant. It does not."). And the Court sees no reason to depart from this principle (nor has Garda argued that the Court should).[3]

Accordingly, El-Sayed, at least at summary judgment, took sufficient steps to apply for a branch supervisory position. El-Sayed testified that Garda frequently promoted people, including himself, without a formal application process, or without even posting certain openings. See Doc. No. 32-2 at 32 (discussing how El-Sayed received a promotion to drive a route through Maine which was never posted); id. at 35-37 (discussing how El-Sayed received a promotion and pay increase, without formally applying for it, to team leader, simply by informing his superiors that he knew the requisite number of routes to become a team leader). El-Sayed also testified that, as early as April 2013, he had voiced interest in a supervisory branch position. See Doc. No. 32-2 at 27-28 (discussing, in the course of explaining how El-Sayed became responsible for a route in Maine on April 24, 2013, that he had "ask[ed] to get in a position in the vault and to get to the mid-management," and had spoken with at least three superiors about this desire). From this record, a jury could infer both that Garda employed an ad hoc process, whereby informal expressions of desires for new roles or titles could suffice to warrant a promotion, and that El-Sayed had sufficiently expressed his own interest in a branch supervisory role as early as April 2013. The Court thus rejects the argument that any failure on El-Sayed's part to formally apply for a promotion warrants summary judgment for Garda.

    2.    *Rodriguez's New Position*

---

[3] Because "[t]he Massachusetts Supreme Judicial Court has said that it is 'our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. ch. 151B,'" Ponte v. Steelcase Inc., 741 F.3d 310, 319 n. 9 (1st Cir. 2014) (quoting Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (1994)), the Court relies on federal law interpreting Title VII in resolving this motion.

The Court likewise finds that El-Sayed has proffered sufficient evidence to create a genuine factual dispute over whether Rodriguez's new position constituted a promotion. El-Sayed testified that in December 2013 or January 2014, he arrived at the Needham branch to return money from his route and encountered some troubles which required a supervisor's help to resolve. Doc. No. 32-2 at 147. And when a branch employee went to retrieve a supervisor, he returned with Rodriguez, who brought with him a supervisor badge. Id. A jury could thus infer from this that Rodriguez received a promotion stemming from his increased responsibilities and perks (such as the supervisor badge) and the increased prestige other branch employees viewed him with. See Alvarado v. Texas Rangers, 492 F.3d 605, 614 (5th Cir. 2007) ("[W]e conclude that the denial of a transfer may . . . qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action."); id. (listing, among other factors, whether a new position "provides greater responsibility or better job duties" as something to consider in determining if one position is objectively better than another); c.f. Billings v. Town of Grafton, 515 F.3d 54 (1st Cir. 2008) (holding, in the context of determining if a plaintiff's job transfer constituted a materially adverse employment action to support a Title VII retaliation claim, that "[a] jury could find that, as a result of the transfer, [the plaintiff] occupied an objectively less prestigious job.").

    3.    *Steps Two and Three*

Since El-Sayed has fulfilled his prima facie case, at least at summary judgment, the Court turns to the next two prongs of the McDonnell-Douglas framework. At the second step, "the burden of production shifts to [Garda, which] must establish a legitimate, nondiscriminatory reason for the adverse employment action." Ray, 799 F.3d at 113. Garda's legitimate reason for


failing to promote El-Sayed to Rodriguez's position is that Rodriguez did not in fact receive a promotion, and the undisputed evidence that Rodriguez's compensation and classification remained unchanged after his transfer fulfills Garda's burden of production.

At the final step, El-Sayed "must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination.'" Id. (quoting Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) (alteration, citation, and internal quotation marks omitted)). The record contains sufficient evidence, at least at summary judgment, for El-Sayed to meet this burden. First, El-Sayed submitted a sworn affidavit that Chris Mustard ("Mustard") and Tony Medina ("Medina") were two of his supervisors with extensive authority over his work, including "whether [he] would be promoted." Doc. No. 39-4 ¶ 3. He also testified in his deposition that Mustard would call him an "Egyptian mother F . . . in each conversation," Doc. No. 32-2 at 166, and that he would frequently play a video and share with the whole branch stories of Egyptian police engaging in torture. Id. at 166-68. He also testified that both Mustard and Medina would call him a "Muslim MF," and that Medina would remark in a disparaging way that Egypt permitted polygamy. Id. at 174. Drawing all inferences in El-Sayed's favor, a reasonable jury could infer that two individuals with influence over the decision to not promote El-Sayed harbored, expressed, and relied upon, anti-Muslim and anti-Egyptian animus. See Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004) (noting that, inter alia, plaintiffs can use "evidence of discriminatory comments" to show that an employer's stated legitimate reason for an employment decision was a pretext for discrimination). El-Sayed thus has adduced sufficient evidence to survive summary judgment. Therefore, to the extent El-Sayed's failure to promote

claim involves Garda's transfer of Rodriguez to his new role at the Needham branch, Garda's motion is DENIED.

      B.     <u>Counts II and III-Hostile Environment Claims</u>

Counts II and III of El-Sayed's Complaint allege the creation of hostile environments based off harassment regarding El-Sayed's Muslim religion and Egyptian national origin, respectively. Doc. No. 1-1 ¶¶ 23, 26. Garda does not contend that El-Sayed has failed to offer sufficient evidence of a hostile environment to overcome summary judgment. Rather, Garda argues that El-Sayed failed to exhaust his administrative remedies on this claim before filing suit, Doc. No. 31 at 4. Garda also argues that, to the extent El-Sayed seeks relief for a constructive discharge, it is entitled to summary judgment because "the undisputed evidence shows the real reason for [El-Sayed's] resignation: he was suffering from one or more medical conditions that prevented him from performing his job duties." Id. at 7. While El-Sayed's Complaint does not specifically enumerate constructive discharge as a ground for relief, he does allege that he "has been constructively discharged." Doc. No. 1-1 ¶ 7. The Court thus construes him as raising constructive discharge claims on the bases of religious and national origin harassment.

Ch. 151B requires "individuals claiming unlawful discrimination [to] first exhaust their administrative remedies" before the Massachusetts Commission Against Discrimination ("MCAD"). <u>Gasior v. Massachusetts Gen. Hosp.</u>, 846 N.E.2d 1133, 1140 (Mass. 2006) (citing Mass. Gen. Laws ch. 151B § 9). This requirement is jurisdictional, and failure to exhaust compels dismissal of the Complaint. See <u>Everett v. 357 Corp.</u>, 904 N.E.2d 733, 750 (Mass. 2009). Courts use the "scope of the investigation rule" to determine if a plaintiff has sufficiently exhausted his claims. <u>Pelletier v. Town of Somerset</u>, 939 N.E.2d 717, 727 (Mass. 2010). "Under the 'scope of the investigation' rule, 'a claim that is not explicitly stated in the

10

administrative complaint may be asserted in the subsequent . . . action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover.'" Id. (quoting Everett, 904 N.E.2d at 748).

Because hostile environment and constructive discharge are two different claims, see Green v. Brennan, 136 S. Ct. 1769, 1779 (2016) (explaining that the Supreme Court has "expressly held that constructive discharge is a claim distinct from the underlying discriminatory act") (citing Pennsylvania State Police v. Suders, 524 U.S. 129, 149 (2004)), the Court examines El-Sayed's MCAD complaint to see if both the hostile environment and constructive discharge claims fell within the scope of a reasonable investigation. The latter did not.

A constructive discharge plaintiff must prove both "that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign," and "that he actually resigned." Id. at 7. Far from providing any indication that El-Sayed had ended his employment with Garda, his MCAD complaint specifically states that "he is still employed with the company in the same position." Doc. No. 39-1 ¶ 4. Nor did El-Sayed offer any evidence that he amended his MCAD complaint or otherwise indicated (such as in his briefings before MCAD) that he ended his employment with Garda. [4]Accordingly, a reasonable investigation into El-Sayed's MCAD complaint would not uncover a constructive discharge claim and, to the extent El-Sayed asserts a constructive discharge claim in Counts II and/or III, those claims are DISMISSED and Garda's motion is ALLOWED.[5]

---

[4] Tellingly, El-Sayed contends in his opposition papers that his last day of employment at Garda was "on or before March 31, 2014," Doc. No. 38 at 7, yet he did not file his MCAD Complaint until July 1, 2014. Doc. No. 39-1 at 5.

[5] Because El-Sayed did not exhaust any claim of constructive discharge, the Court does not address Garda's merits arguments on that issue.

11

The hostile environment claims present a closer question. While El-Sayed's MCAD complaint did not specifically enumerate any hostile environment claims, see Doc. No. 39-1 at 3 (listing only one count, the failure to promote claim), El-Sayed did allege, in the "Facts" section of his MCAD complaint, the following:

> Soon after commencing employment with Garda, Mr. El-Sayed's coworkers and managers began to regularly harass him about his ethnicity and religion. Specifically, Garda employees would make derogatory comments and jokes about Mr. El-Sayed's Egyptian heritage and following the Boston Marathon Bombings on April 15, 2014 [sic], Garda employees targeted Mr. El-Sayed with disparaging comments about his religion and Muslims in general.

Id. ¶ 6. El-Sayed also incorporated this allegation in his discussion of the failure to promote claim. Id. ¶ 16 ("Paragraphs 1 through 12 are hereby incorporated as if fully set forth herein.").

This allegation in El-Sayed's MCAD complaint sufficed to exhaust his hostile environment claims. El-Sayed brought to MCAD's attention that certain coworkers harassed him on both religious and national origin grounds, that they did so via derogatory and disparaging comments and jokes, and that this occurred, on national origin grounds, from shortly after he began working at Garda, expanding to include religious harassment after the Boston Marathon bombings. A reasonable investigation thus would examine these allegations. See Swallow v. Fetzer Vineyards, 46 F. App'x 636, 645-46 (1st Cir. 2002) (holding that a plaintiff whose MCAD complaint contained only an unlawful termination claim had also exhausted a failure to promote claim when the affidavit she attached to her MCAD complaint mentioned the failure to promote her); Windross v. Vill. Auto. Grp., Inc., 887 N.E.2d 303, 309 (Mass. App. Ct. 2008) ("Although the words 'hostile work environment' do not appear in the complaint, Windross alleged specific underlying facts describing a work environment in which he was persistently subjected to racially abusive comments and other conduct throughout the course of

his employment that implicitly was severe and pervasive enough to interfere with the performance of his work. No more was required.").

Garda contends that Lattimore v. Polaroid Corp., 99 F.3d 456 (1st Cir. 1996), instructs that El-Sayed failed to exhaust. The Court disagrees. In Lattimore, the plaintiff filed an MCAD complaint alleging that after he suffered a back injury, his employer discriminated against him on the bases of race and disability by both harassing him and firing him. Id. at 461. The plaintiff then filed suit, and brought claims which included harassment from before his back injury. See id. at 463. Noting that the plaintiff's "charge focused exclusively on his termination and the events leading up to it, all of which occurred after his injury," and "contain[ed] no hint of any claim that before his injury, [the plaintiff] was harassed" at all, the First Circuit held that "the harassment claims [were] beyond the scope of [the plaintiff's] administrative charge," and that "judgment as a matter of law should be entered in favor of" the defendant. Id. at 465.

This case is distinguishable. Unlike Lattimore, El-Sayed specifically included an allegation that he experienced harassment from his coworkers prior to Garda's failure to promote him. This avoids the temporal disjunction that troubled the Lattimore Court. See Lattimore, 99 F.3d at 465 ("The two claims are based upon different facts that are separate and distinct both qualitatively and temporally."). Indeed, the harassment El-Sayed allegedly experienced may help support his failure to promote claim by showing discriminatory animus within Garda. See Rathbun, 361 F.3d at 72 (noting that, inter alia, plaintiffs can use "evidence of discriminatory comments" to show that an employer's stated legitimate reason for an employment decision was a pretext for discrimination). Thus, Garda's motion, to the extent it argues that El-Sayed failed to exhaust hostile environment claims stemming from religious and/or national origin harassment, is DENIED.

IV.     CONCLUSION

For the foregoing reasons, Garda's Motion for Summary Judgment, Doc. No. 30, is ALLOWED IN PART AND DENIED IN PART.  The parties shall file a joint status report, within ten days, proposing a schedule for expert discovery, advising whether they wish a referral to the Court's mediation program (and if so, when), and suggesting time for trial of this matter after the conclusion of expert discovery.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge